**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **RITA CLINTON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 18-991 (RMC)** |
| ) | |
| **RICK PERRY,** ) | |
| **Secretary, U.S. Department of Energy,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

### MEMORANDUM OPINION

Rita Clinton was terminated from employment at the United States Department of Energy (DOE) in July 2017 and sues Secretary Rick Perry here, alleging that she was fired in retaliation for prior equal-employment-opportunity (EEO) complaints. The government moves to dismiss her Complaint, arguing that it fails to allege an adequate causal connection between Ms. Clinton's EEO activity and her termination. DOE also contends that it had a legitimate nondiscriminatory reason for Ms. Clinton's discharge. The former point is a very close question on which the Complaint survives a motion to dismiss; the latter point is premature and may benefit from additional facts and further briefing on summary judgment. The Motion to Dismiss will be denied.

### I. FACTS

Rita Clinton served as a Director and member of the Senior Executive Service (SES) in DOE's Office of the Chief Human Capital Officer from June 2010 until her termination in July 2017. Compl. [Dkt. 1] ¶¶ 14, 63.[1] In June 2010, she served as Director, Office of Human

---

[1] The Complaint states that Ms. Clinton appealed her termination to the Merit Systems Protection Board (MSPB) and advanced an affirmative defense of EEO retaliation against DOE's non-discriminatory reason for its action. Compl. ¶ 10. The Initial Decision of the MSPB dismissing her

Resources Services. *Id*. ¶ 15. On July 1, 2015 she began to serve as Director, Office of Corporate

Human Resources Operations, an HC-30 position. MSPB Dec. at 2, ¶ 3.[2] In that position, she was

"responsible for overseeing the full range of human capital management operational functions to

support DOE employees (non-executives) . . . ." Compl. ¶ 17. "The responsibility for processing

suitability determination cases falls within the chain of command of the HC-30 Director." *Id.* ¶ 18.[3]

On January 24, 2016, Loretta Collier, Director of the Office of Human Capital Policy

Accountability and Technology (HC-10), and Ms. Clinton switched positions. *See id*. ¶¶ 19-20;

MSPB Dec. at 2, ¶¶ 5-6. Thereafter, Ms. Clinton served as Acting Director and then Director of

HC-10 and Ms. Collier served as Director of HC-30, with responsibility for processing suitability

determination cases. *See* MSPB Dec. at 2, ¶ 5; Compl. ¶¶ 19-21. Ms. Clinton's new HC-10

position was responsible for overseeing the HC-30 position she had previously held. Compl. ¶ 36.

The processing of suitability determination cases requires a Top Secret "Q"

clearance. *Id*. ¶¶ 18, 22. Neither Ms. Clinton nor Ms. Collier had the requisite clearance. *Id*. ¶ 23.

Such cases had been adjudicated by HC-30 employee Mark Petts, who held the required clearance

and training by the Office of Personnel Management (OPM), until Mr. Petts retired from DOE in

July 2015. *Id*. ¶¶ 26-27. As Director of HC-30, Ms. Clinton "would be copied on the suitability

emails received in HC-30 for processing." *Id.* ¶ 24.[4] According to the Complaint, Ms. Clinton "did

---

claim is appended as an exhibit to the government's opposition, *see* Ex. 1, Def.'s Mot. to Dismiss
[Dkt. 10], MSPB Initial Decision (MSBP Dec.) [Dkt. 10-1]. The Court cites to it for the
stipulations to which Ms. Clinton and the government agreed in that matter.

[2] The Complaint asserts that Ms. Clinton became HC-30 Director on October 4, 2015. *See* Compl. ¶
16. The Court substitutes the date of July 1, 2015 when Ms. Clinton became HC-30 Director from
the stipulations of Ms. Clinton and DOE before the MSPB. *See* MSPB Dec. at 2, ¶ 3.

[3] Suitability determinations are decisions as to whether a candidate is "suitable" for a specific
position, most often used to determine eligibility for a security clearance.

[4] The reference in Complaint paragraph 24 erroneously states that Ms. Clinton received notification
of suitability determination cases starting in 2010, rather than 2015.

not open these suitability emails; she created a folder and she would move the emails to the folder created when they arrived." *Id.* ¶ 25.

In anticipation of Mr. Petts' departure, Ms. Clinton assigned Rashida Jackson and Eryka Johnson to handle the suitability determinations. *Id.* ¶ 28. However, neither Ms. Jackson nor Ms. Johnson had the necessary Q clearance so Ms. Clinton called the Director of Headquarters, Personnel Security Division, and asked her to provide interim clearances to both women. *Id.* ¶¶ 28-30. The Complaint asserts that Ms. Clinton "had every reason to believe that the interim clearances for Ms. Jackson and Ms. Johnson would be processed and expedited since this was a process she and Ms. Grimes had undertaken numerous times since 2010 . . . ." *Id.* ¶ 33.

Further, when Ms. Clinton and Ms. Collier switched positions in January 2016, Ms. Clinton "conducted meetings with Ms. Collier to update her on the projects within HC-30, and she discussed the suitability cases with Ms. Collier," even though Tonya Mackey, Ms. Clinton's first level supervisor, did not ask her "whether she had updated Ms. Collier regarding suitability cases." *Id.* ¶¶ 37, 39; *but see* MSPB Dec. at 2-3, ¶ 6 ("Upon being detailed to each other's prior position as HC-10 and HC-30 Directors, [Ms. Clinton] *did not mention to her successor,* Loretta Collier, that *the processing of suitability determination cases was a pending action item* within the chain of command of the HC-30 Director.") (emphasis added). As it turns out, neither Ms. Jackson nor Ms. Johnson had received an interim clearance or a Q clearance prior to January 2016, when Ms. Clinton left HC-30 and became HC-10 Director; in fact, "[a]s of at least March 18, 2016, neither Rashida Jackson nor Eryka Johnson had a Top Secret 'Q' clearance." MSPB Dec. at 3, ¶ 8. Additionally, Ms. Collier "did not undertake to learn the status of suitability cases when she assumed her position as Acting Director of HC-30 as required." Compl. ¶ 41.

At an unspecified time in 2016, Ms. Collier sent Ms. Clinton an email "and asked her if she had received '87 emails in January' regarding the suitability cases"; Ms. Clinton answered

that "she had not received 87 cases in January." *Id.* ¶¶ 42-43. On about December 2, 2016, Ms.

Clinton met with Ms. Mackey, Deputy Chief Human Capital Officer, and her second level

supervisor, Ken Venuto, Director of Human Capital Management, about the suitability cases. *Id.*

¶¶ 44-45. Asked whether she had received the suitability cases when she was Director, HC-30, and

"[b]elieving that Ms. Mackey was referring to the 87 cases [Ms. Clinton] was asked by Ms. Collier

ha[d] she received in . . . the month of January 2016, [Ms. Clinton] responded no." *Id.* ¶ 45. Ms.

Mackey "did not clarify her request or inquire further" during the December 2, 2016 meeting. *Id.*

¶ 48. Ms. Clinton informed Ms. Mackey and Mr. Venuto that she had contacted the Director of

Headquarters Security Operations in the Office of Environment, Health, Safety and Security in

November 2016, by phone and email, and "he agreed to re-send the suitability cases," presumably

to HC-30 Director Collier. *Id.* ¶ 49-50.

Despite Ms. Clinton's apparent confusion about the questions regarding her receipt

of the suitability cases, she does admit that she "receive[d] e-mails [sic] . . . with pending suitability

determination cases between the dates of July 29, 2015 and May 25, 2016, which she filed into an e-

mail folder entitled 'Personnel Security.' The sum total of those emails over the ten (10) month

period was likely 87." *Id.* ¶ 46; *see also* MSPB Dec. at 3, ¶ 9 ("[Ms. Clinton] received 87

e-mails . . . with pending suitability determination cases between the dates of July 29, 2015 and

May 25, 2016, which she filed into an e-mail folder entitled 'Personnel Security.'").

Ms. Clinton thought it "remarkable" that her first- and second-line supervisors were

questioning her concerning "matters dating several months back, but within days of Ms. Mackey

and Mr. Venuto being questioned by the EEO counselor regarding the EEO complaint that [she] had

filed against the two of them" in March 2016. Compl. ¶ 53. Ms. Clinton was thereafter notified of

a proposal to remove her due to misconduct based on a charge of lack of candor; after written and

oral responses, Ingrid Kolb, Director, Office of Management and the Deciding Official, issued a

final decision to remove her, effective July 20, 2017. *Id.* ¶¶ 54, 63; *see also* MSPB Dec. at 3, ¶¶ 13-16.

Before her termination, Ms. Clinton had filed two EEO complaints with DOE—the first on January 27, 2014 (DOE Case No. 13-0131-HQ-ME) and the second on March 23, 2016 (DOE Case No. 16-0049-HQ-ME). Compl. ¶¶ 56-57. The March 2016 EEO complaint was filed against Ms. Clinton's first- and second-level supervisors, Ms. Mackey and Mr. Venuto. *Id.* ¶¶ 52-53. Mr. Venuto had been Ms. Clinton's first-level supervisor from January 2013 through January 23, 2016; Ms. Mackey became her first-level supervisor on January 24, 2016. *Id.* ¶¶ 58-59. Ms. Clinton alleges that Mses. Mackey and Kolb and Mr. Venuto were all aware of her EEO activity, *id.* ¶¶ 60-61, and that the December 2, 2016 meeting about her performance occurred "within days of Ms. Mackey and Mr. Venuto being questioned by the EEO counselor." *Id.* ¶ 53.

Ms. Clinton challenged her termination before the MSPB and received the Initial Decision affirming her termination on February 20, 2018; the decision became final on March 27, 2018. *Id.* ¶ 10. She filed this suit on April 26, 2018, within 30 days of the final MSPB decision. *Id.* ¶ 11. The government moved to dismiss on August 13, 2018 and the motion is ripe for review.[5]

## II. LEGAL STANDARDS

### A. Jurisdiction

The Court has jurisdiction over this matter under 28 U.S.C. § 1331, as the claim arises under a law of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Venue is also proper in the District of Columbia because DOE is located in the District, Ms. Clinton was employed at DOE in the District, and a substantial portion of the actions complained of occurred in the District. *See* 28 U.S.C. § 1391.

---

[5] *See* Def.'s Mot. to Dismiss (Mot.) [Dkt. 10]; Complainant's [sic] Opp'n to Def.'s Mot. to Dismiss (Opp'n) [Dkt. 12]; Def.'s Reply in Supp. of Mot. to Dismiss [Dkt. 14].

**B. Motion to Dismiss Pursuant to Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to be sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need to include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The facts alleged "must be enough to raise a right to relief above the speculative level." *Id*. A complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Id.* at 570. When a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. A court need not accept as true legal conclusions set forth in a complaint. *Iqbal*, 556 U.S. at 678.[6]

### III. ANALYSIS

The Complaint contains one count: discrimination on the basis of reprisal in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* To bring an actionable claim, Ms. Clinton must show "(1) that [s]he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against h[er]; and (3) that the employer took the action 'because' the employee opposed the practice." *McGrath v. Clinton*, 666

---

[6] Somewhat prematurely, the government has briefed much more than a dismissal motion, delving deep into the merits and the standard applicable on summary judgment. While such diligence may be admirable, it also took unnecessary time at this stage of the case.

F.3d 1377, 1380 (D.C. Cir. 2012); *see also* 42 U.S.C. § 2000e-3(a). Retaliation occurs when an

employer's action would discourage a reasonable employee from further pursuit of EEO rights. *See*

*Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006); *Thompson v. N. Am.*

*Stainless, LP*, 562 U.S. 170, 179 (2011) (Ginsburg, J., concurring) ("In its Compliance Manual, the

EEOC counsels that Title VII 'prohibits retaliation against someone so closely related to or

associated with the person exercising his or her statutory rights that it would discourage or prevent

the person from pursuing those rights.'") (citation omitted). "A plaintiff alleging retaliation faces a

low hurdle at the motion to dismiss stage, and need not present evidence of pretext." *Winston v.*

*Clough*, 712 F. Supp. 2d 1, 11 (D.D.C. 2010).

    The government acknowledges that Ms. Clinton engaged in protected activity (filing

EEO complaints) and that she was subject to a materially adverse action (termination). It argues

that she has failed to include sufficient factual allegations to support a causal link between her

protected activity and her termination.

    Critical to the analysis is the timing and nature of the government's motion. As

described above, a plaintiff facing a motion to dismiss must only allege enough facts to make out a

"plausible" claim, which "is not akin to a probability requirement." *Iqbal*, 556 U.S. at 678. In this

endeavor, the court must treat the plaintiff's factual allegations "as true (even if doubtful in fact)."

*Twombly*, 550 U.S. at 555. In other words, the motion rises or falls on the adequacy of the

complaint.

    Without direct evidence, causation may be supported by a combination of allegations

that the agency knew of the employee's protected activity, *see Mitchell v. Baldrige*, 759 F.2d 80, 86

(D.C. Cir. 1985),[7] and that the protected activity occurred close enough in time to the adverse action

---

[7] *Cf. Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012) (rejecting argument in motion to
dismiss that complaint did not allege that supervisor knew of employee protected activity and

to infer a connection between them, *see Hamilton*, 666 F.3d at 1358 (noting that there is no "bright-line three-month rule," and that somewhat more or somewhat less time may suffice); *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007); *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003). In addition, "other factual allegations . . . , construed in the light most favorable to the plaintiff, [may] 'plausibly' establish this element of the claim." *Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9, 38 (D.D.C. 2018) (quoting *Twombly*, 550 U.S. at 570).

Ms. Clinton alleges that Ms. Mackey and Mr. Venuto, the managers who questioned her handling of the suitability cases, and Ms. Kolb, who made the final decision to terminate Ms. Clinton, were all aware of her EEO complaints. Compl. ¶¶ 60-61. The government argues that Ms. Clinton's latest EEO complaint was filed more than eight months before the December 2, 2016 meeting concerning the adjudication of suitability cases and that eight months is well past the timeline suggested by *Hamilton*.

*Hamilton v. Geithner* provides a useful discussion on the point. Mr. Hamilton complained that he suffered retaliation when another person received a promotion for which Mr. Hamilton had applied. *Hamilton*, 666 F.3d at 1348. Emphasizing the need for temporal proximity between protected activity and retaliatory act, *Hamilton* held that protected activity may occur at different times, *i.e.*, receiving EEO counseling, filing a formal EEO complaint, providing an investigatory affidavit, etc., and proximity to an adverse action should be measured from the last such protected activity. *Id.* at 1357-58. *Hamilton* also cautions that "'positive evidence beyond mere proximity is required to defeat the presumption that the [employer's] proffered [nondiscriminatory] explanations are genuine.'" *Id.* at 1359 (quoting *Woodruff*, 482 F.3d at 530). Ms. Clinton alleges that both Ms. Mackey and Mr. Venuto were questioned by the EEO counselor

---

finding "at the prima facie stage the fact that Hamilton submitted the [EEO] complaint to the agency is sufficient" (citing *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009))).

investigating her March 2016 EEO complaint "within days" of their meeting with Ms. Clinton on December 2 to discuss suitability determination cases. Compl. ¶ 53. There can be no doubt that the counselor's interviews were prompted by Ms. Clinton's EEO charge and that the critical meeting, at which Ms. Clinton misunderstood the question about the suitability e-mails, took place very soon thereafter. Clinging solely to the date on which Ms. Clinton filed her charge, the government fails to address the arguable causal connection between the supervisors' immediate obligation to respond to her protected activity and the December meeting.

"Considering the 'minimal burden' imposed at the prima facie[, and motion to dismiss,] stage," the Court finds Ms. Clinton's allegations sufficient to present a plausible case of retaliation. *Hamilton*, 666 F.3d at 1359; *see also Winston*, 712 F. Supp. 2d at 11. Having litigated Ms. Clinton's discharge before the MSPB, the government has explained its legitimate, non-retaliatory reason for the adverse action in that forum. However, Ms. Clinton has appealed only her retaliation complaint under Title VII, her formal Complaint in this Court just survives a motion to dismiss, and the MSPB decision, which addressed the merits, does not speak to the adequacy of the instant Title VII Complaint.

## IV. CONCLUSION

The Court will deny Defendant's motion to dismiss [Dkt. 10]. A memorializing Order accompanies this Memorandum Opinion.


Date: February 15, 2019 _____
ROSEMARY M. COLLYER
United States District Judge