## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RITA CLINTON,<br><br>　　　　　　*Plaintiff*,<br><br>　v.<br><br>JENNIFER GRANHOLM, *in her official capacity as Secretary of the United States Department of Energy*,<br><br>　　　　　　*Defendant*. | No. 18-cv-991 (DLF) |

## <u>MEMORANDUM OPINION</u>

Rita Clinton brings this action against the Secretary of the Department of Energy (the Department),[1] alleging that she was subject to retaliation in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* (Title VII), while working for the Department. Before the Court is the Department's Motion for Summary Judgment, Dkt. 26. For the reasons that follow, the Court will grant the motion.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    *Clinton's Employment and the Suitability Case Backlog*

From June 2010 to July 2017, the Department of Energy employed Clinton in a Senior Executive Service position in the Department's Office of the Chief Human Capital Officer.[2] *See*

---

[1] When this suit began, Rick Perry was the Secretary of the Department of Energy. When Jennifer Granholm became the Secretary, she was automatically substituted as the proper defendant. *See* Fed. R. Civ. P. 25(d).

[2] The Court cites to either the defendant's statement of facts, Dkt. 26-1, or the defendant's response to plaintiff's statement of genuine issues, Dkt. 30-1, if a fact is undisputed. *See*

Def.'s Stmt. of Facts ¶¶ 1–3.  From June 2010 to January 23, 2016, Clinton was Director of Corporate Human Resources Operations.  *Id.* ¶ 1.  From then until July 20, 2017, Clinton was Director of Human Capital Policy and Accountability.  *Id.* ¶¶ 1–2, 57.  The Department ultimately terminated Clinton for lack of candor, effective July 20, 2017.  *Id.* ¶¶ 3, 51, 56–57.

The Department's Office of the Chief Human Capital Officer was responsible for adjudicating suitability determination cases.  *See* Pl.'s Mem. of P. & A. in Supp. of Pl.'s Opp'n at 14, Dkt. 28; Def.'s Resps. to Pl.'s First Set of Disc. Reqs., Merit Systems Protection Board Case No. DC-0752-17-0743-I-1, at 156–57, Dkt. 28-5; Def.'s Resp. ¶ 24.  By way of background, an employment suitability review is a tool for determining whether covered employees are suitable for competitive federal employment.  *See* 5 C.F.R. § 731.101 *et seq*.  Mark Petts, a Labor Specialist within Clinton's chain of command, conducted suitability reviews until he left the Department on July 11, 2015.  Def.'s Resp. ¶ 24; Def.'s Stmt. of Facts ¶¶ 11–12.  After Petts's departure, however, the Department's Office of Environment, Health, Safety, and Security sent all new suitability cases exclusively to Clinton.  Def.'s Stmt. of Facts ¶ 12.

On December 30, 2015, Tyrone Eddins, Personnel Security Team Lead in the Office of Environment, Health, Safety, and Security, emailed Clinton to inquire about the status of

---

*Hawkins v. District of Columbia*, No. 17-cv-1982, 2020 WL 601886, at *4 (D.D.C. Feb. 7, 2020) ("[I]n ruling on a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted . . . in [the non-moving party's] opposition to the motion." (internal quotation omitted)).  Otherwise, the opinion recounts the facts as established in "depositions, answers to interrogatories, and admissions on file, together with the affidavits" to determine whether there is any "genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56).  The opinion notes where the facts are disputed.

pending suitability cases. *Id.* ¶ 13. Eddins acknowledged that Clinton was in the process of filling the vacancy but expressed concern that some pending applicants were approaching their one-year mark. *Id.* On January 21, 2016, Clinton responded to Eddins, noting that she had designated Rashida Jackson and Eryka Johnson to assume personnel security responsibilities after Petts's departure and that neither individual possessed the required security clearance to begin reviewing cases. *Id.* ¶¶ 14–15. *But see* Def.'s Resp. ¶ 51 (denying that Clinton delegated responsibility to Jackson or Johnson because neither had the requisite clearance). Clinton also mentioned a "backlog of cases," Def.'s Stmt. of Facts ¶ 15 (internal quotation marks omitted), that "we can work on" once Jackson and Johnson received clearance, Eddins Email at 14, Dkt. 26-10. Eddins then suggested the possibility of an interoffice detail for an employee in his office to assist with the backlog. Def.'s Stmt. of Facts ¶ 16. Clinton directed Eddins to discuss this possibility with Jackson, whom Clinton stated "will eventually" manage the program. *Id.*

On January 24, 2016, Clinton was detailed to a new position as Director of Human Capital Policy and Accountability. *Id.* ¶ 17. Aspects of that process are disputed. *Compare* Pl.'s Stmt. of Disputed Facts ¶ 31, Dkt. 28-2, *with* Def.'s Resp. ¶ 31. On the one hand, the parties agree that Mackey, Deputy Chief Human Capital Officer, Def.'s Stmt. of Facts ¶ 4, stated in an Equal Employment Opportunity (EEO) affidavit that she was involved in the decision to detail Clinton as part of the Office's senior leadership, but she later gave deposition testimony that she was not involved in the decision. Def.'s Resp. ¶¶ 102–103. On the other hand, although Loretta Collier, Clinton's replacement, did not apply for the detail to Director of Corporate Human Resources Operations, the parties dispute whether Collier was "appointed to" that detail. *Compare id.* ¶ 31, *with* Pl.'s Stmt. of Disputed Facts ¶ 31. They also dispute whether Mackey instructed Clinton and Collier to conduct a formal transition. *Compare* Def.'s Stmt. of Facts ¶ 17

(asserting that Mackey told both Clinton and Collier "to conduct a thorough turnover of duties"), *with* Pl.'s Resps. ¶ 17, Dkt. 28-1 (asserting that Mackey initiated weekly meetings with Clinton but never mentioned the suitability cases).

On January 25, 2016, Clinton sent Collier a summary of action items that did not include any reference to the pending suitability cases that had been sent to her since Petts's departure in July.  Def.'s Stmt. of Facts ¶ 18.  Clinton's summary also failed to reference her discussions with Eddins about the backlog and lack of cleared personnel to work on the issue.  *Id.*  Clinton denies that she failed to mention the suitability case backlog and problems with employee clearance during turnover meetings with Collier or her regular meetings with Mackey.  Pl.'s Resp. ¶ 19. She further claims that she had weekly meetings with Collier about "general issues and circumstances."  Pl.'s Stmt. of Disputed Facts ¶ 42.  *But see* Def.'s Resp. ¶ 42 (noting that Clinton fails to identify any portion of the record adequate to support her weekly meetings with Collier on general issues and circumstances).  Collier admitted, however, that she "had responsibility for issues [that arose], even if they were not raised to her first."  *Id.* ¶ 41.  Clinton claims, yet the Department denies, that Collier learned about the issues with suitability cases around March or April 2016 in an email from Jackson.  *Id.* ¶ 45 (noting that the cited portion of the record only shows that Collier was alerted to a suitability adjudication question for a single employee).

Clinton was not responsible for adjudicating suitability cases in her position as Director of Human Capital Policy and Accountability; the position's job description contained no reference to the adjudication of suitability cases.  *Id.* ¶ 23.  Collier would have been responsible for the suitability backlog had Clinton turned over the duty and informed Collier that there was a backlog of such cases to be reviewed.  *Id.* ¶ 24.  The Department listed Clinton and Collier as

having the same responsibility "for oversight and management of the suitability program." *Id.*
¶ 28.  Finally, Collier was aware that her office was responsible for adjudicating suitability cases.
*Id.* ¶ 47.

On February 17, 2016, over three weeks after Collier and Clinton received their new
details, Clinton sent an email to Eddins and Jackson following up on the suitability cases and
noting that she continued to receive "document requests."  Def.'s Stmt. of Facts ¶ 20.  Eddins
replied that "[n]o arrangement has been set at this time" and attached emails between himself
and Jackson indicating that an interoffice detail was not possible, as Jackson was still unable to
supervise the program for lack of security clearance.  *Id.* ¶ 21.

On March 17, 2016, Clinton forwarded Jackson an email regarding a suspension of
security clearance, copying Collier and asking Jackson if she had engaged in further discussions
with Eddins's office about the suitability program.  *Id.* ¶¶ 22–23.  Jackson responded the next
day that Eddins's office could not assist with the suitability cases, that she and Johnson still
lacked the requisite clearance, and that another employee named Donna Williams-Dixon had the
necessary clearance and would soon receive training.  *See id.*

On May 27, 2016, Collier emailed Clinton informing her of a request for information
about a suitability case sent to Clinton in April 2016 and asking whether Clinton had passed the
case along.  *Id.* ¶ 24.  Clinton responded several days later that "I have not opened any emails
from Personnel Security with the understanding that [Jackson's office was] handling all cases."
*Id.* ¶ 25.

On June 23, 2016, Amanda Lowry, an employee in the Office of Environment, Health,
Safety, and Security, emailed Clinton asking if she was still the point of contact for suitability
requests.  *Id.* ¶ 26.  Clinton copied Jackson and Eddins, responding that the two had been

working together on identifying "an interim person to complete the suitability program." *Id.*
¶ 27.  Jackson replied that Williams-Dixon was the current point of contact.  *Id.* ¶ 28.

On July 19, 2016, Williams-Dixon contacted Eddins; she explained that she had
discussed the backlog with Clinton and asked for a suitability report detailing all outstanding
cases for federal employees.  *Id.* ¶ 29.  Eddins sent Williams-Dixon three emails on August 8,
2016, listing eighty-seven suitability cases sent for adjudication and stating that they had been
"sent to Rita Clinton."  *Id.* ¶ 30 (internal quotation marks omitted).  When she spoke to Eddins
again on August 25, 2016, Williams-Dixon learned of ninety-one additional suitability cases that
needed review in addition to the eighty-seven "old" cases.  *Id.* ¶ 31.  Eddins followed up on
October 8, 2016 and November 1, 2016, and Williams-Dixon explained that she did not have any
of the eighty-seven original cases in her possession to review.  *Id.* ¶ 32.  Eddins expressed
concern about the inability to locate previously submitted suitability cases.  *Id.*

On November 1, 2016, Collier asked Eddins if he had a record of where his office had
sent the suitability emails.  *Id.* ¶ 34.  Following this email, Clinton separately replied to Collier
that she "assumed this was already resolved" and forwarded two emails as background.  *Id.* ¶ 35.
Clinton forwarded her January 21, 2016 email to Eddins about his initial offer to assist with the
backlog and her February 17, 2016 email to Eddins seeking confirmation that an arrangement
had been put into place.  *Id.* ¶ 36.  She did not forward Eddins's February 18, 2016 reply,
however, which stated that "no arrangement had been set at this time" and attached documents
making clear that it would be impossible for his office to assist because his employees—Jackson
and Johnson—lacked the necessary security clearances.  *Id.* ¶¶ 21, 36.  Collier replied to Clinton,
explaining that no one knew the suitability cases' location and that the Office of Environment,
Health, Safety, and Security had indicated it had sent them to Clinton in January 2016, and she

asked Clinton whether she had received the initial set of eighty-seven cases. *Id.* ¶ 37. Clinton responded in full: "[n]o, I did not receive 87 cases in January. That's why I sent you the emails where [Eddins] offered to have a member of his staff assist but that seem[s] to have fallen through the cracks." *Id.*

Eddins "shared a list of 87 suitability cases . . . sent to Clinton" on November 2, 2016, although Clinton denies that they were sent solely to her. *Compare id.* ¶ 38, *with* Pl.'s Reply ¶ 39. On November 4, 2016, Clinton sent a separate email to Anita Edwards, an employee in the Department's Office of Environment, Health, Safety, and Security, discussing Eddins's earlier emails to Collier and noting that she "did not retain any of the suitability documents," having instead deleted them. Def.'s Resp. ¶ 73; Def.'s Stmt. of Facts ¶ 39. Though Clinton denies that Edwards recommended she talk to Mike Zimmerman, another employee in Personnel Security, Pl.'s Resps. ¶ 41, the parties agree that Clinton emailed Zimmerman that day "to set up a time to talk," this time forwarding four emails as background, including the February 18, 2016 email from Eddins that she failed to forward to Collier. Def.'s Stmt. of Facts ¶ 41. On the same day, Clinton informed Zimmerman by phone that "she had deleted the suitability determination emails from her computer," *id.* ¶ 42, although Clinton asserts that she assumed at the time that she had deleted them because she "had been cleaning out her inbox," Pl.'s Resp. ¶ 43.

On November 10 and November 15, 2016, Mackey received emails from Clinton informing Mackey of the problems she was having locating suitability cases and the backlog of cases yet to be processed. Def.'s Stmt. of Facts ¶ 43. Mackey scheduled a meeting with Clinton and Kenneth Venuto, Director of Human Capital Management, on December 5, 2016. *Id.* ¶ 44. During the meeting, Mackey asked Clinton if she had received suitability determination emails from the Office of Environment, Health, Safety, and Security starting in July 2015. *Id.* ¶ 45.

The Department asserts, but Clinton disputes, that Clinton denied receiving the emails.  Pl.'s Resp. ¶ 46 (claiming that Mackey asked whether Clinton had received anything about the suitability program, and Clinton replied that she had not been involved with the program while she was detailed).  The parties agree, however, that Clinton told Mackey three things during the meeting: that Stephanie Grimes, a Supervisory Security Specialist in the Office of Environment, Health, Safety, and Security, had begun adjudicating suitability cases after Petts left the Department; that Clinton was aware of a backlog of suitability cases; and that Clinton had received an October 2016 email from Mike Zimmerman indicating that he would handle the cases.  Def.'s Stmt. of Fact ¶ 46.

On December 7, 2016, Mackey asked Clinton for a copy of the email from Zimmerman that she had mentioned in the December 5th meeting.  *Id.* ¶ 47.  Clinton denies that she refused to comply with Mackey's request, yet the parties agree that Clinton responded to Mackey's email, asking: "[w]hy am I required to provide emails, etc. to validate what I have communicated to you and Ken[?]"  *Compare id.* ¶ 48 (asserting that Clinton refused to comply with the request and stated that her word should be sufficient), *with* Pl.'s Resp. ¶ 49 (disputing that Clinton refused to comply and claiming that she merely questioned the need to provide emails).  Throughout December 2016 and January 2017, Mackey requested further information from Zimmerman, Collier, and Jackson about the suitability case backlog.  Def.'s Stmt. of Facts ¶ 49.  At the same time, the Office of the Chief Human Capital Officer executed a search of Clinton's email account, seeking the suitability cases listed as being sent to Clinton.  *Id.* ¶ 50.

Clinton was reassigned to a Senior Executive Service position as Director of Human Capital Policy and Accountability, despite having expressed a desire to serve a different detail as Human Resources Director at the Bonneville Power Administration.  Def.'s Resp. ¶ 12.  In a

2017 EEO affidavit, Clinton stated that Mackey and Chief Human Capital Officer Robert Gibbs were the deciding officials for that detail assignment.  *Id.* ¶ 13.  Clinton began her new detail in January 2016 and continued in the position until her removal in July 2017.  Def.'s Stmt. of Facts ¶¶ 2–3, 56.

Clinton's detail to Director of Human Capital Policy and Accountability became effective on January 24, 2016, ended on September 23, 2016, and was extended to October 23, 2016. Def.'s Resp. ¶ 39.  Clinton expected to return to her previous position once the detail ended.  *Id.* ¶ 37.  Clinton claims, but the Department denies, that her reassignment to Director of Human Capital Policy and Accountability was effective December 21, 2016.  *Compare id.* ¶ 40 (asserting Clinton's reassignment was effective December 11, 2016), *with* Pl.'s Stmt. of Disputed Facts ¶ 40.  Clinton further claims that she did not expect to be involved with suitability cases once her detail ended because Jackson and Shared Services Centers would be in charge of the suitability program.  *See* Clinton Dep. at 118, Dkt. 28-8; Pl.'s Stmt. of Disputed Facts ¶ 38.  *But see* Def.'s Resp. ¶ 38 (denying that Shared Services Centers were in charge of suitability adjudications).

Clinton also states that, while Mackey delayed processing her detail request in December 2016, Mackey expedited a detail for another employee, Shannon Vaughns.  Def.'s Resp. ¶ 29. When asked about the reason for the differing treatment, Mackey explained to an EEO counselor that Vaughns had "applied to" a detail, while Clinton merely "requested" a detail.  *Id.* ¶ 30. Clinton had informed Collier that appointing Vaughns to the Human Resources detail "would disrupt the work for which Clinton was responsible in Human Capital Policy and Accountability, as Vaughns was the lead audit[or] and . . . an audit [was] scheduled for the second quarter of the fiscal year."  *Id.* ¶ 32.  Clinton claims, but the Department disputes, that Mackey told her to

postpone the audit. *Compare id.* ¶ 33 *with* Pl.'s Stmt. of Disputed Facts ¶ 33.  Clinton also told

Mackey that Vaughns's Human Resources detail "was a sudden shift . . . in priorities over a

crucial compliance audit of the improper passing over of veterans, and noted that there was an

urgency to fill positions before [a] potential hiring freeze."  Def.'s Resp. ¶ 34 (internal quotation

marks omitted).

2. *Clinton's EEO Complaints*

On February 28, 2017, Clinton filed a third amendment to an EEO complaint first filed

March 23, 2016 (the March 2016 complaint), which raised various claims regarding unfair

treatment and Clinton's ability to carry out her duties in light of responsible management

officials' actions.  Pl.'s Stmt. of Disputed Facts ¶¶ 2, 11.  *But see* Def.'s Resp. ¶ 11 (noting that

what Clinton refers to as the third amendment to her second complaint (the March 2016

complaint) was used as the basis for her third formal complaint filed on April 17, 2017).  Clinton

asserted in her March 2016 complaint that white, male Senior Executive Service employees were

treated more favorably than Clinton and were not removed for more egregious conduct.  *See* Pl.'s

Stmt. of Disputed Facts ¶¶ 21–22.  *But see* Def.'s Resp. ¶¶ 21–22 (noting that the EEO affidavit

Clinton cites in support of her assertions shows that her proposed comparators were not similarly

situated because they engaged in different misconduct and worked in different offices).  Clinton

further claimed  that male employees who were granted details were not required to prepare their

own expression of interest announcements.  *See* Pl.'s Stmt. of Disputed Facts ¶ 100–01.  *But see*

Def.'s Resp. ¶ 100–01 (noting that the male comparators were not similarly situated because they

were from different offices with details occurring during different time periods and that the white

executives were not similarly situated because they worked in different offices and engaged in

different misconduct from Clinton).  Finally, Clinton claimed that white executives were not

10

removed regardless of the charges against them.  No other employee was disciplined or reprimanded in connection with the suitability backlog.  Def.'s Resp. ¶¶ 95–96.

Clinton's third EEO Complaint, filed on April 17, 2017 (the April 2017 complaint), named Mackey, Gibbs, and Venuto as responsible management officials.  Def.'s Resp. ¶¶ 1, 3. The April 2017 complaint alleged discrimination on the basis of race, sex, and age for the non-selection to a detail and because the named responsible management officials "inhibit[ed] Clinton's ability to carry out new duties as the Agency's Accountability Officer to mitigate continuing violations of veteran's preference and den[ied] Clinton the ability to allocate sufficient resources to carryout FY17 objectives."  *Id.* ¶¶ 7–8 (alterations omitted).  Ann Augustyn, Director of the EEO Office, noted that Clinton first contacted the office regarding this complaint on February 28, 2017, that Clinton submitted the intake counseling form on March 8, 2017, and that the EEO counselor submitted a report on March 17, 2017.  *Id.* ¶¶ 9–10, 16. Mackey and Venuto were aware of Clinton's EEO activity.  *Id.* ¶¶ 4–5.  Clinton also stated in an EEO affidavit that, shortly before Mackey issued the Notice for Proposed Removal, Augustyn informed Clinton that Gibbs was "very upset" because Clinton had filed her third EEO claim. Pl.'s Stmt. of Disputed Facts ¶ 104.  *But see* Def.'s Reply ¶ 104 (admitting that Clinton made the statement in an affidavit but denying that Augustyn ever actually spoke to Clinton regarding Gibbs).

### 3. *Clinton's Removal from Federal Service*

On April 21, 2017, Mackey issued Clinton a Notice of Proposed Removal based on lack of candor.  Def.'s Stmt. of Facts ¶ 51.  The Notice alleged that Clinton lacked candor on several occasions, including when she: (1) denied in her December 2016 meeting with Mackey and Venuto that she had received suitability determination case emails; (2) failed to notify Collier

about receiving suitability emails during the 2016 transition; and (3) stated to Mackey that Zimmerman had agreed to help take care of the backlog.  *Id.* ¶ 52.  Clinton denies the truth of the allegations in the Notice.  Pl.'s Resp. ¶ 52.  She also takes issue with the claim that Mackey "counseled" her on several occasions regarding lack of candor, accountability, leadership, and collaboration.  *See id.* ¶ 53 (noting that Clinton was not on notice that Mackey's emails were considered counseling).  Clinton made written and oral replies through counsel to the deciding official, Director of the Office of Management Ingrid Kolb, which stated in part that she had responded to Mackey that she had not received the emails because she "did not recall receiving the emails."  Def.'s Stmt. of Facts ¶¶ 54–55.

On July 17, 2017, Kolb informed Clinton of her decision to remove Clinton from federal service effective July 20, 2017.  Decision on Notice of Proposed Removal, Dkt. 26-27.  In the Decision on Notice of Proposed Removal, Kolb considered and rejected Clinton's arguments in response to the Notice of Proposed Removal.  *Id.*  For example, regarding Clinton's argument that she did not take action on the suitability emails because she was only copied on them, Kolb noted that the emails were sent *solely* to Clinton.  *See id.* at 2.  Kolb likewise refuted Clinton's argument that she had not opened the emails, since "[o]n at least one instance[,] [Clinton] opened a message in November 2015 and sent a response about the e-mail not being encrypted."  *Id.*  Kolb also considered Clinton's otherwise unblemished disciplinary record, as well as the disciplinary action taken in similar cases, and ultimately found removal to be the appropriate penalty in light of the evidence.  *Id.* at 1, 4.

Clinton appealed her removal to the Merit Systems Protection Board, where she had hearings before an Administrative Law Judge (ALJ) on December 7 and 8, 2017, and January 9, 2018.  Def.'s Stmt. of Facts ¶ 58.  The ALJ sustained the decision to remove Clinton on February

20, 2018, holding that: (1) the Department had established Clinton's charged lack of candor by a preponderance of the evidence; (2) Clinton had provided insufficient circumstantial evidence of reprisal; and (3) the Department would have taken the same action in the absence of Clinton's protected EEO activity.  *Id.* ¶¶ 59–60.

### B.     Procedural History

In her complaint, Clinton asserts a single retaliation claim under Title VII, alleging that the Department subjected her to removal as retaliation for prior EEO activity.  *See* Compl. ¶¶ 68–83, Dkt. 1.  On August 13, 2018, the Department filed its Motion to Dismiss, which the Court denied.  *See Clinton v. Perry*, No. 18-991, 2019 WL 652344, at *5 (D.D.C. Feb. 15, 2019) (Collyer, J.) (holding that Clinton's allegations met the "minimal burden" of the motion to dismiss stage).  On April 30, 2020, the Department filed this motion for summary judgment, which is now ripe for review.

## II.     LEGAL STANDARDS

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one with potential to change the substantive outcome of the litigation.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).  A party "opposing summary judgment" must "substantiate [its allegations] with evidence" that "a reasonable jury could credit in support

of each essential element of [its] claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). The moving party is entitled to summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. ANALYSIS

### A. Clinton's Retaliatory Discharge Claim

Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee because she has opposed a practice that Title VII forbids. 42 U.S.C. § 2000e-3(a). Where, as here, a plaintiff relies only on circumstantial evidence of retaliation under Title VII, the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of retaliation. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (per curiam). To establish a prima facie case of retaliation under Title VII, the plaintiff must show (1) that she engaged in statutorily protected activity; (2) that she was subjected to a materially adverse employment action; and (3) that there is sufficient evidence to infer a causal connection between the protected activity and the employment action. *Id.* "Adverse actions" in the retaliation context are "not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 64 (2006). But a plaintiff must show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted).

14

If the plaintiff states a prima facie case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the challenged action.  *Wiley*, 511 F.3d at 155 (internal quotation marks omitted).  If the employer is able to articulate such a reason, the D.C. Circuit has held that asking whether the plaintiff satisfied her burden to show a prima facie case of retaliation is "an unnecessary and improper sideshow" that "the district court need not—*and should not*—decide."  *Jones*, 557 F.3d at 678 (internal quotation marks omitted); *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

Because "the *Brady* shortcut applies only if the parties properly move past the second step," the Court begins with the question of whether the employer has satisfied its burden to articulate a legitimate nondiscriminatory reason for its actions.  *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019).   The D.C. Circuit identified four factors to help answer this question: (1) that the employer produced "evidence that a factfinder may consider [at summary judgment];" (2) that "the factfinder, if it believed the evidence, [could reasonably] find that the employer's action was motivated by a nondiscriminatory reason;" (3) that the nondiscriminatory reason is "facially credible in light of the proffered evidence;" and (4) that the evidence presents "a clear and reasonably specific explanation as to how the employer[] applied [its] standards to the employee's particular circumstances."  *Id.* at 1087–88 (internal quotation marks omitted).

If the employer does articulate a nondiscriminatory justification, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence."  *Jones*, 557 F.3d at 677 (internal quotation marks omitted).  In sum, the question of whether the employer provided a legitimate non-discriminatory reason does not resolve whether the employer is entitled summary judgment.

Rather, it merely opens the door to the ultimate question of the weight of the record evidence.
*Id.*

        1.    *The Department's Legitimate Nondiscriminatory Reason*

Here, the Department has articulated a legitimate nondiscriminatory reason for removing Clinton: her lack of candor regarding the suitability determination cases before and during Mackey's investigation. Def.'s Stmt. of Facts ¶¶ 52–53, 56.

Each of the four *Figueroa* factors support this finding. 923 F.3d at 1087–88. First, the Department submitted substantial documentary evidence that neither party disputes a factfinder could consider at summary judgment to support the Department's nondiscriminatory explanation. *Id.* at 1087 (listing the first factor). That evidence includes the Notice of Proposed Removal that Mackey issued to Clinton, Notice of Proposed Removal, Dkt. 26-4, Clinton's response to the Notice, Pl.'s Resp. to Notice of Proposed Removal, Dkt. 26-26, and Kolb's Decision approving Clinton's removal from federal service, Decision on Notice of Proposed Removal, Dkt. 26-27. The Department has also submitted many of the primary source communications that Mackey and Kolb relied on when making their decisions. *See* Def.'s Mot., Exs. 4, 9–10, 13–14, 20–24, Dkt. 26 (collecting various emails relevant to the investigation into the suitability case backlog); *see also* Notice of Proposed Removal at 2–3 (describing the primary sources that Mackey relied on); Decision on Notice of Proposed Removal at 1 (noting that "[t]he events described in the Proposal are fully supported by the evidence in the record," which included "supporting emails and employee statements" as well as Clinton's oral and written response).

Second, a factfinder who believed the Department's evidence could reasonably find that the Department's decision to remove Clinton was motivated by a nondiscriminatory reason.

*Figueroa*, 923 F.3d at 1087 (listing the second factor).  The Notice describes multiple incidents that formed the basis of the Department's lack of candor finding: (1) a "December 5, 2016 meeting with Plaintiff's supervisors where Plaintiff denied receiving suitability determination e-mails;" (2) Clinton's "failure to notify Ms. Collier about receiving e-mails . . . at the time of transition;" and (3) Clinton's statement that "Mr. Zimmerman agreed to take care of the backlog."  Def.'s Stmt. of Facts ¶ 52.  Kolb's decision also describes in detail how Clinton "purposely withheld information from [her] successor and supervisor about [her] lack of action on at least 87 suitability cases, which resulted in a significant backlog," and why her arguments in response were rebutted by the objective evidence.  Decision on Notice of Removal at 1–2.  At this threshold inquiry, the Department need only "raise a genuine issue of fact as to whether the employer intentionally discriminated against the employee" to satisfy its step two burden. *Figueroa*, 923 F.3d at 1087 (internal quotation marks omitted).  A factfinder reviewing Mackey and Kolb's reports, as well as the emails and other underlying materials, could believe the evidence and reasonably conclude that the Department was motivated by the nondiscriminatory reasons described in its reports.  *See* Def.'s Stmt. of Facts ¶¶ 52–53; Notice of Proposed Removal at 2–3; Decision on Notice of Proposed Removal at 1.

Third, the Department's nondiscriminatory explanation is at least facially credible in light of the proffered evidence.  *Figueroa*, 923 F.3d at 1088 (listing the third factor).  An employer's nondiscriminatory explanation may lack facial credibility if it is so internally inconsistent as to prevent a reasonable factfinder from crediting its rationale.  *See id.*; *Bishopp v. District of Columbia*, 788 F.2d 781, 788–89 (D.C. Cir. 1986).  Here, the Department supports its nondiscriminatory explanation with Mackey's Notice of Proposed Removal and Kolb's Decision approving that proposal.  *See generally* Notice of Proposed Removal; Decision on Notice of

Proposed Removal.  And the two reports' rationales are internally consistent.  Each considers all

of the relevant factors, including the nature and seriousness of the offense, Clinton's position in

the Senior Executive Service, her past disciplinary and work records, the effect of misconduct on

Clinton's ability to perform and maintain supervisor confidence, the consistency of penalty, the

impact of misconduct on the Department, the clarity of notice, the potential for rehabilitation, the

mitigating circumstances, and the adequacy of alternative sanctions to deter future misconduct.

*See* Notice of Proposed Removal at 13–24; Decision on Notice of Proposed Removal at 6–13.

Clinton does not dispute that both reports shared a common framework and rationale.  *Compare*

Pl.'s Resp. ¶¶ 53, 56 *with*, Def.'s Stmt. of Facts ¶¶ 53, 56.

Finally, the Department presents a "clear and reasonably specific explanation" for its

removal of Clinton.  *Figueroa*, 923 F.3d at 1088 (internal quotation marks omitted) (listing the

fourth factor).  Mackey and Kolb's reports each charged one count of lack of candor and

identified specific instances of that alleged misconduct to justify their actions against Clinton.

*See* Notice of Proposed Removal at 3; Decision on Notice of Proposed Removal at 2–4; Def.'s

Stmt. of Facts ¶¶ 51–52, 56.  These explanations were sufficiently clear and specific to allow

Clinton ample opportunity to bring forward evidence to "disprove [the] defendant's reasons."

*Figueroa*, 923 F.3d at 1088 (internal quotation marks omitted).  In conclusion, the Department

has provided a legitimate, non-discriminatory explanation for Clinton's removal.

## 2.   *The Ultimate Issue of Retaliation*

With the Department satisfying its burden to articulate a legitimate, nondiscriminatory

reason for the adverse action, the burden-shifting framework reverts to a single question:

"whether the employee's evidence creates a material dispute on the ultimate issue of retaliation

either directly by [showing] that a discriminatory reason more likely motivated the employer or

indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jones*, 557 F.3d at 678 (internal quotation marks omitted).

To answer this question, courts must review "each of the three relevant categories of evidence—prima facie, pretext, and any other—to determine whether they either separately or in combination provide sufficient evidence for a reasonable jury to infer retaliation." *Id.* at 679 (internal quotation marks omitted). In this analysis "evidence of pretext is not *per se* sufficient to permit an inference of discrimination," although it "[u]sually . . . will be enough to get a plaintiff's claim to a jury." *Id.* (internal quotation marks omitted). An employer that has presented a legitimate, nondiscriminatory explanation can prevail on the ultimate issue of retaliation "either upon the employee's failure to rebut its explanation or upon the employee's failure to prove an element of her case." *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009).

As an initial matter, neither party argues that Clinton's EEO complaints were not statutorily protected activity nor that the Department's decision to remove Clinton from her position and federal service was not a materially adverse employment action. Def.'s Mot. at 20; Def.'s Reply at 2. Instead, this case comes down to causation. Because Clinton does not produce sufficient record evidence of a causal connection between her protected EEO activity and the claimed adverse employment action, even a jury drawing all reasonable inferences in her favor could not infer that the Department's decision was an act of retaliation under Title VII. For this reason, the Department is entitled to summary judgment.

Clinton relies primarily on temporal evidence to show a causal connection between her protected EEO activity and the Department's adverse employment action, arguing that temporal proximity between her 2017 EEO complaints and Mackey's issuance of the Notice establishes but-for causation. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). She

points to the March 2016 complaint (her second EEO complaint, amended on February 28, 2017), and the April 2017 complaint (her third EEO complaint, originating in the February 28, 2017 amendment).  Def.'s Resp. ¶¶ 1–11, 16–17.  Clinton argues that these complaints were sufficiently proximate to Mackey's decision to issue the Notice of Proposed Removal on April 21, 2017 to establish a causal connection between her protected activity and Mackey's issuance of the Notice.  Pl.'s Opp'n at 10–12.  While "mere temporal proximity may establish causation," *Keys v. Donovan*, 37 F. Supp. 3d 368, 372 (D.D.C. 2014), to do so, "the temporal proximity must be very close."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (per curiam) (internal quotation marks omitted) (collecting cases finding three and four-month periods between plaintiffs' protected activity and adverse employment actions insufficient to establish causation based on temporal proximity).

Clinton is correct that both her February 28, 2017 amendment and April 17, 2017 complaint occurred close in time to Mackey's issuance of the Notice; however, these events do not represent the relevant temporal analysis.  *See* Def.'s Resp. ¶¶ 1–11, 16–17, 105.  Mackey's issuance of the Notice was not a discrete event divorced from the Department's activity investigating Clinton's role in the suitability case backlog.  *See generally* Notice of Proposed Removal; Decision on Notice of Proposed Removal.  And that investigation was ongoing well before Clinton's 2017 EEO complaints.  Indeed, both parties agree that the investigation focused on Clinton shortly after Mackey was first notified of the suitability case problems in November 2016.  *See* Notice of Proposed Removal at 2–6; Decision on Notice of Proposed Removal at 2–4; Def.'s Resp. ¶ 105.

The fact that an employer "proceed[ed] along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  *Clark Cnty. Sch. Dist.*, 532

U.S. at 272 (explaining that an employer following through on a transfer it had been contemplating before learning of its employee's protected activity had no bearing on causation). Nor can an employee prove causation by simply showing that an employer's ongoing process, set in motion *before* the relevant protected activity occurred, continued to its logical conclusion after the employee engaged in protected activity.  *Beckford v. Geithner*, 661 F. Supp. 2d 17, 24 (D.D.C. 2009) (where a poor performance review was already in progress before an employee filed an EEO complaint, the proximity of the final review to protected activity "cannot prove causality").  Just so here.  The Notice, and the ultimate decision to remove Clinton,[3] was the culmination of an ongoing departmental process that began with an investigation, evolved into a proposal for removal, and ended with the removal for lack of candor.  Def.'s Resp. ¶ 105; Def.'s Stmt. of Facts ¶¶ 44–53, 56–57.  Each step of the process was based on conduct which occurred well *before* Clinton's 2017 EEO complaints except for her March 23, 2016 filing.  Def.'s Stmt. of Facts ¶¶ 18, 37, 44–46, 51–53, 56–57.  And Clinton's initial March 23, 2016 EEO complaint—the only EEO complaint that predates the investigation of Clinton that began in November 2016, Def.'s Resp. ¶¶ 2, 105—is too attenuated to establish causation based on temporal proximity alone.  *Clark Cnty. Sch. Dist.*, 532 U.S. at 273.

Besides the temporal evidence, Clinton also references a disputed conversation with EEO Director Ann Augustyn about another decisionmaker's views of one of Clinton's EEO complaints.  *See* Pl.'s Stmt. of Disputed Facts ¶ 104.  In particular, Clinton alleges that the EEO Director told her that Chief Human Capital Officer Robert Gibbs was "very upset" that Clinton

---

[3] While Clinton does not base her argument on the temporal relationship between her EEO complaints and Kolb's issuance of the final decision removing her from federal service on July 17, 2017, *see* Pl.'s Opp'n at 9–13, the same reasoning would negate any such claim, *see Clark Cnty. Sch. Dist.*, 532 U.S. at 273, as the removal was the culmination of an ongoing process that predated Clinton's later EEO complaints, *see* Def.'s Resp. ¶¶ 2, 105.

had filed a third EEO complaint.  *Id.*  The Department disputes whether Augustyn ever spoke to Clinton about Gibbs.  Def.'s Resp. ¶ 104.

In any case, this dispute does not preclude summary judgment.  Clinton's assertion relies on two levels of hearsay—first, the statement of Augustyn to Clinton, and second, the statement from Gibbs to Augustyn.  And "[w]hile a nonmovant is not required to produce evidence in a form that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence."  *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).  "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  *Id.* (citing Fed. R. Civ. P. 56(e)).  Here, there is no indication that Clinton's double hearsay statement could be converted into admissible evidence.  Indeed, the D.C. Circuit affirmed a grant of summary judgment in an analogous situation, where the plaintiff testified that someone had informed her of a conversation in which two other individuals made comments that indicated a pretextual motivation.  *Id.*  The Court reasoned that the plaintiff's "evidence about the conversation is sheer hearsay; she would not be permitted to testify about the conversation at trial.  It therefore counts for nothing."  *Id.* (citation omitted); *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (quoting *Gleklen*, 199 F.3d at 1369).  The same is true here.

Finally, Clinton briefly points to potential comparators whom she alleges were treated more fairly than she.  Pl.'s Stmt. of Disputed Facts ¶¶ 21–22, 95–96, 100–101.  "A plaintiff can establish pretext masking a discriminatory motive by presenting 'evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances.'"  *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015)

(quoting *Brady*, 520 F.3d at 495).   But to serve as a comparator, the other employee must be "similarly situated" to the plaintiff.  *Id.*  "To prove that [s]he is similarly situated to another employee, a plaintiff must demonstrate that [she] and the allegedly similarly situated . . . employee were charged with offenses of comparable seriousness."  *Id.* (internal quotation marks omitted).  "A plaintiff must also demonstrate that all of the relevant aspects of [her] employment situation were nearly identical to those of the [other] employee."  *Id.*  "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses."  *Id.*  At summary judgment, "where a plaintiff relying on comparator evidence fails to produce evidence that the comparators were actually similarly situated to [her], an inference of falsity or discrimination is not reasonable, and summary judgement is appropriate."  *Walker v. McCarthy*, 170 F. Supp. 3d 94, 108 (D.D.C. 2016) (internal quotation marks omitted).

The undisputed facts demonstrate that all but one of Clinton's external comparators worked in different offices than she did.  *See* Pl.'s EEO Aff. at 24–25, Dkt. 28-4.  The one comparator who worked in the Office of the Chief Human Capital Officer, James Costey, was issued a proposal for termination during his probationary period but was allowed to remain on the rolls until he found a different position.  *Id.*  Clinton offers no argument or record evidence to support the proposition that Costey was similarly situated to her.  *See generally* Pl.'s Opp'n & Exs.  Nor are Clinton's internal comparators similarly situated.   It is true that the other employees involved with the suitability cases were not disciplined.  *See* Def.'s Resp. ¶¶ 95–96.  But Clinton was removed for lack of candor, not simply because she was involved in the problems surrounding the suitability case backlog.  *See* Def.'s Stmt. of Facts. ¶¶ 51–53, 56.

Without evidence that any of the other employees who were tasked with resolving the suitability cases showed a lack of candor, they cannot serve as appropriate comparators. *See Walker*, 170 F. Supp. 3d at 108. Because Clinton offers no evidence that any of her alleged comparators were similarly situated to her, there is no genuine dispute of material fact on this issue. *Id.* A jury, drawing all reasonable inferences in Clinton's favor, could not find that she has shown a causal relationship between her statutorily protected activity and the Department's claimed adverse employment action, an essential element of the case. *See Taylor*, 571 F.3d at 1320; *see Jones*, 557 F.3d at 678. All the more true in light of the Department's legitimate explanation for Clinton's termination, which was supported by a lengthy investigation and objective evidence. For these reasons, summary judgment is appropriate.

### B.     Clinton's Retaliatory Hostile Work Environment Harassment Claim

Clinton also briefly mentions that the Department's acts created a retaliatory hostile work environment. *See* Pl.'s Opp'n at 1–2, 8–9 (alleging that "the Agency's acts constitute retaliatory hostile work environment harassment"). Her complaint, however, only contains *one* count of retaliation with mere stray references to a hostile work environment. *See* Compl. ¶¶ 68–83. But her briefing references certain allegations that Clinton contends are sufficient to establish a hostile work environment, such as denying her a desired detail, detailing one of her subordinates into a different office, and forcing her to prepare her own expression of interest.[4] Pl.'s Opp'n at 13, 15–16.

---

[4] Clinton asserts, and the Department disputes, that potential comparators were not required to prepare their own expressions of interest. Pl.'s Stmt. of Disputed Facts ¶ 100. Because Clinton fails to cite any record evidence that supports this proposition, however, the dispute is not genuine and summary judgment is appropriate. Pl.'s EEO Aff. at 24–25 (mentioning comparators only in the context of discipline); *Anderson*, 477 U.S. at 247.

To the extent that these references, taken together, could be construed as a separate retaliatory hostile work environment claim, the Court has already ruled on the claim. *See Clinton v. Brouillette*, No. 19-cv-01674, 2020 WL 4784688, at *5 (D.D.C. Aug. 18, 2020) (holding that a reasonable jury could not, viewing the evidence in the light most favorable to Clinton, find that the Department subjected Clinton "to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" (internal quotation marks omitted)), *aff'd Clinton v. Granholm*, No. 20-5290 (D.C. Cir. March 19, 2021) (summary affirmance). The Court's previous opinion analyzed the same instances of conduct that Clinton alleges are at issue here, holding that they failed to rise to the level of a hostile work environment. *Id.* at *4 (holding that "most of Clinton's complaints—including those about the delay and denial of her detail, her employee being detailed elsewhere, being asked to prepare an announcement for her own detail, and feeling undermined by supervisors during a meeting in front of her employees—are ordinary tribulations of the workplace" (internal quotation marks omitted)). For the same reasons, assuming any retaliatory hostile work environment claim exists here, it does not survive summary judgment. *See Grimes*, 794 F.3d at 94.

**CONCLUSION**

For the foregoing reasons, the defendant's motion for summary judgment is granted.  A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

March 26, 2021